INGRAM v. CANAL BANK & TRUST CO. ET AL.

---

(April 7, 1930. Opinion and Decree.)
(May 5, 1930. Rehearing Refused.)
(July 2, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

---

Harold A. Moise, of New Orleans, attorney for William Perry Brown, plaintiff, appellee.

Hopkins & Talbot, of New Orleans, attorneys for Mrs. Sallie Ingram, wife of Zeb Carter, plaintiff, appellee.

Manning W. Heard and William W. Ogden, of New Orleans, attorneys for Union Indemnity Company, defendants, appellants.

WESTERFIELD, J. This is an action ex delicto based upon damages sustained by plaintiff alleged to be due to false and fraudulent representations made by Harry W. Fitzpatrick and William Perry Brown in connection with the purchase by plaintiff of certain lots in the state of Florida at an auction sale conducted by Fitzpatrick & Co. in the city of New Orleans on March 27, 1926. The Canal Bank and Trust Company and the Whitney-Central Trust and Savings Bank are made parties defendant in their capacity as judicial liquidator of the Fitzpatrick firm and as administrator of the succession of Harry W. Fitzpatrick, who died shortly after the transaction complained of. The Union Indemnity Company is made party defendant as surety on the auctioneer's bond of Harry Fitzpatrick and as surety on the real estate broker's bond of the Fitzpatrick Company. Mrs. Fitzpatrick, the mother of the defendant Harry Fitzpatrick is also joined as defendant, as a partner in the Fitzpatrick firm. Exceptions of no cause or right of action, misjoinder and nonjoinder of parties defendant were overruled. Answers were filed in behalf of the several defendants, in which the defense is made that Harry W. Fitzpatrick individually and Harry Fitzpatrick & Co., were acting as agents for a disclosed principal, and were therefore not liable personally to third persons. There was judgment below in favor of plaintiff against each of the defendants, as prayed for, with the exception of William Perry Brown, and as to Brown plaintiff's suit was dismissed. Of the defendants the Union Indemnity Company alone appealed. Plaintiff appealed from the judgment in favor of William Perry Brown.

This case is an unpleasant consequence of the recent extraordinary real estate boom in Florida. The record shows that one of the large operators in Florida real estate, a firm by the name of Whidden Realty Company, in some manner induced Harry W. Fitzpatrick, of the firm of Harry W. Fitzpatrick & Co. of New Orleans, to conduct an auction sale of a number of small lots of land situated on the East Coast of Florida near a town called Arcadia. A written contract was entered into between the Whidden firm and the Fitzpatrick firm whereby the Fitzpatrick firm was appointed exclusive agent for the sale of the property mentioned on a basis of 8 per cent upon the first $100,000 realized and 33⅓ per cent on the excess, the Whidden Realty Com-

pany agreeing to pay $15,000 for advertising expenses. This contract was negotiated by the manager of the Fitzpatrick Company, Mr. William Perry Brown, who had been sent to Florida for the purpose of investigating the property and making inquiry as to the responsibility of the Whidden firm. Immediately following the confection of this agreement a campaign of advertising was begun in the city of New Orleans of the most unusual and seductive character. We select the following example, which appeared in large letters and covered the space of two pages in a daily newspaper:

"MR AND MRS AVERAGE CITIZEN:
"Meet us at the ANTHENAEUM Friday —2 p. m.—7:30 p. m.

"We have Arranged for Your Entertainment a Spectacle Unique and Unrivaled in the Annals of Our City—A Veritable Fairyland of Tropical Flowers and Fruits from Florida Where Sunshine Reigns Always—Where Play is Monarch and Profit Is Handmaiden. You will Participate in the Free Distribution of All Prizes. Everybody Present Will Have a Chance.

"FREE $500.00 IN GOLD—FLORIDA FRUITS—BAND CONCERT—FOUR BEAUTIFUL LOTS FREE

"Somebody's sure to Gain! Why not You? At Any Rate You Will Receive Your Share of the Generous Supply of Presents.

"ESPERANZA HEIGHTS, ARCADIA, FLA.
"ON THE 'EAST TO WEST COAST BOULEVARD'

"To Be Sold In Your Presence—One Lot or More as Desired, Friday, March 26th. At AUCTION Friday, March 26th.

"MARK WELL! These lots Are Not High-Priced, Plutocratic, Out of Reach Properties. On the Contrary—They are just the Kind of Investment Lucky Poor People Have Been Buying for a Song, and Selling for a King's Ransom.

"YOU ALL KNOW THE STORY.

"How Thousands of Investors of Moderate Means Took a Chance Yesterday on Cheap Sites in Many Different Parts of Florida and Today are Independent and Free from Care. What Happened Yesterday Will Take Place Tomorrow.

"COME! BE OUR GUESTS!

"Enjoy Yourselves—Win Some Free Prizes and See Sights You Cannot Buy at the Picture Show or Newsstand. Phone, Write or Wire for Pictorial and Descriptive Literature.

"HARRY W. FITZPATRICK & COMPANY ORGANIZATION

"Harry W. Fitzpatrick, Auctioneer; Wm. Perry Brown, Manager, Main 4328 & 5462; HOME OFFICE: 224 Royal St., NEW ORLEANS, La.; Branch Offices: Biloxi, Miss., Pascagoula, Miss. Mobile, Ala."

Booklets were distributed to the number of five thousand, containing maps and pictures, interspersed with reading matter calculated to attract purchasers. The name "Esperanza Heights," which was given to the property, was featured in all advertising. The front page of the booklet referred to, which was illustrated with palm trees and houses with colored tile roofs midst foliage of tropical luxuriance, bore the poetical lure:

"ESPERANZA HEIGHTS
"On the 'East to West Coast Boulevard' "ARCADIA—FLORIDA

"Here Reality Confounds Fiction—Longfellow tell that in days gonebye Evangeline's people found peace in the Arcadia of old. The past prophesies for the future that plenty will join peace in waiting on the footsteps of all who buy this modern Arcadia."

On a flyleaf of this booklet, under the caption "Foreword," the following appears:

"TRADITION tells that treasure is found at the foot of every rainbow. The history of the last two years shows that the real gold pots are concealed in every bit of Southern road and water frontage. We dare you to lose money on what you buy from us! You couldn't if you tried!

"At our last sale in Biloxi we challenged any buyer who had failed to make profit following 'The Fitzpatrick Way' on the Gulf Coast for twelve months to stand up

and claim five hundred dollars reward. Nobody responded.

"Now, after investigating Florida thoroughly and conscientiously, we say to you, our clientele, that we *are not* risking our perfect-plus record of profit-producing sales to all our buyers when we conduct this auction. We cannot transport all our New Orleans customers to Arcadia so we have 'brought the mountain to Mahomet' and thus Florida comes to you.

"(Signed) Harry W. Fitzpatrick."

In the issue of March 14, 1926, of the Item-Tribune, a daily newspaper published in the city of New Orleans, there appeared a large advertisement under the caption "Read What Harry W. Fitzpatrick Says About Florida Real Estate." This advertisement begins as follows:

"As Harry Fitzpatrick, prominent auctioneer of New Orleans and one of the pillars of development in our country, besides being heavily interested in Florida, and therefore capable of viewing the subject in its largest aspects, says."

Then follows a two-column quotation from which we extract the following:

"My organization is preaching invest on the Gulf Coast for safe and sure enhancement, and speculate a little, if you can spare the change, around Arcadia, Florida. We will stage a spectacular sale of land in this vicinity at the Athenaeum on March 26th, in the same spirit in which we would invite a party to accompany us to the races, or get up a pool to play the stock market. We say to our friends, 'buy a few lots at a price that you know to be safe, and for an amount that you will never miss, in the hope, strongly backed by unusual prospects and coming development, that the few dimes you spend today will grow into many dollars on the morrow.' "

In the booklet also appears:

## "TITLE GUARANTEED

"By a warranty deed from the Whidden Realty Company, a corporation of Florida, A Guaranteed Title Insurance Policy issued by the Florida Trust and Banking Company which guarantees the purchaser that the title to the property is clear and free of all encumbrances and the Insurance Company agrees that should the title ever be proved not good that they will be responsible to the amount of the policy. The title and abstract has been approved and passed upon by Treadwell and Treadwell, attorneys of Arcadia, Fla., and also approved by Harold Moise, attorney, Whitney Bank Building, and Sol Weiss, attorney, Maïson Blanche Building, New Orleans, La."

The auction was conducted by Mr. Fitzpatrick, with the assistance of about thirty men, who were moving through the audience from time to time, answering questions of prospective purchasers and gathering in their checks covering the down payment upon lots which had been adjudicated to them. The purchasers were entertained with music and dancing and speeches, and, according to the testimony of one of the witnesses, a thorough-bred Indian, in paint and feathers, was presented to them —for what reason *it does not appear.* There were quite a number of lots sold at the auction, and a number of purchasers testified on the trial of this case. Practically all of them declared that they were influenced in buying the lots by their knowledge of the reputation of Mr. Fitzpatrick and his firm. As one witness puts it, "I trusted Mr. Fitzpatrick and listened to him"; another, "Mr. Fitzpatrick said it was such a fine proposition for the people of New Orleans and that he would not mislead his people"; another, "I was dealing with the Fitzpatrick office. I knew nothing of the Whiddens," and another that she had invested in the property because of the fact that she saw the reference to the two local attorneys, Messrs. Harold Moise and Sol Weiss, whose approval of the title appeared in the advertisements. Among the purchasers at the auction was the plaintiff,

who invested $735.15. She, as well as the other buyers at the auction, paid her money to Harry W. Fitzpatrick, and obtained a warranty deed signed by the Whidden Realty Company. When these deeds were presented at the proper office in De Soto county, where the land was located, for recordation, it was discovered that, far from the title being clear, the property was incumbered, the mortgage amounting to $187,-000. This mortgage has since been foreclosed, and the purchasers at the auction have received nothing whatever for their money.

Numerous charges of fraud and misrepresentation are made in plaintiff's petition, and it is doubtful whether some of them have been established by the proof in the record. It is conceded, however, that there was misrepresentation by Fitzpatrick, the auctioneer, in at least two important particulars: First, the title to the lots were not free of incumbrances and the Florida Trust & Banking Company, which had been represented as being willing to guarantee the title to the lots to purchasers, declined to issue its guarantee; second, the title and abstract of the property had not been approved by Messrs. Harold Moise and Sol Weiss of the New Orleans bar. In reference to the first of these misrepresentations, it is argued on behalf of the Fitzpatrick Company that they had relied on assurances of the Florida bank, and had obtained a letter from them which they distributed to prospective purchasers. This letter contained an evasive and ambiguous statement to the effect that, if the title was good, it would be guaranteed. It was so palpably disingenuous that it should have deceived no one, least of all an experienced real estate dealer. As a matter of fact, the bank held the mortgage. As to the alleged approval of the local counsel, Messrs. Moise and Weiss, it is said that assurances with respect to this matter had also been obtained in this instance, from the Whidden Realty Company.

In regard to the pretended approval of the local counsel, Messrs. Moise and Weiss, the record shows that these gentlemen were the attorneys for Mr. Fitzpatrick and his firm, and, according to the testimony of the manager of the Fitzpatrick firm, Mr. Fitzpatrick himself was responsible for that statement appearing in the literature distributed at the sale and in the advertisements. We cannot understand why Mr. Fitzpatrick should not have verified this statement by simple inquiry of his own counsel in New Orleans, particularly since he was at pains to send his manager, Brown, to Florida, to make a first-hand investigation of other statements of the Whidden firm. Both statements were false and misleading, and responsibility therefor was assumed by Fitzpatrick & Company and Harry W. Fitzpatrick on his own account.

It is argued that neither Fitzpatrick nor his firm were guilty of any fraud, and that the misrepresentations of fact appearing in the advertising and repeated at the auction were due to the deception practiced by the Whidden Realty Company and the Florida bank, and that, since Fitzpatrick disclosed his principal, there could be no personal liability on the part of himself, and/or, his firm. In support of this argument, the efforts which were made by Mr. Fitzpatrick, subsequent to the sale and after the discovery of the fact that the purchasers of the lots had been defrauded, to compel restitution by the Whidden Realty Company, of which there is ample evidence in the record, is pointed to as demonstrating his good faith. Moreover, he is shown to have been one of the leading auctioneers and real estate men in the city, and it is said that his reputation was such as to suggest the improbability of improper conduct. Unfor-

tunately Mr. Fitzpatrick died before the trial of this case, and we are deprived of his version of the transaction, but in our opinion it is unnecessary to hold that he was a conscious participant in the fraud which occasioned plaintiff's loss, and we, like the learned judge of the trial court, welcome the opportunity to express our belief in his innocence of intentional wrong.

The record, however, convinces us that the Fitzpatrick firm, of which Mr. Fitzpatrick was the active head, went far beyond what was required of it in execution of any duty it owed its principal in the sale of these lots. In fact, though the name of its principal occasionally appears in an inconspicuous place in the literature and advertising concerning the auction sale, the conclusion is irresistible that Fitzpatrick & Co. with child-like faith had adopted as its own all of the representations made by the none too scrupulous land boom promoter, its principal, and added the weight of its reputation and personal assurance, without which very meager results could have been expected from the sale of Florida lots in Louisiana. The whole tenor of the advertisements, the statements of Mr. Fitzpatrick at the auction, the motives given for purchases made, indicate that it was a Fitzpatrick undertaking. The purchasers were told to purchase "in a Fitzpatrick way," and the weakest of all human frailties appealed to by the glittering words of Mr. Harry W. Fitzpatrick to the effect that "The history of the last two years shows that the real gold pots are concealed in every bit of Southern road and water frontage. We dare you to lose money on what you buy from us! You couldn't if you tried!" and, "We are not risking our perfect plus record of profit-producing sales to all our buyers when we conduct this auction." Gold, with no risk, without the possibility of loss, was theirs if only they would buy the lots. What an irresistible appeal to prospective purchasers of lots in this El Dorado.

Generally speaking, an auctioneer is not personally liable to third persons where his principal is disclosed, but he must keep within the limits of his agency. He, like any other agent, may make himself personally liable by expressly pledging his own responsibility. Mechem on Agency (2d Ed.) volume 2, par. 2344.

In Story on Agency, Ninth Edition, secs. 269, 270, we read the following:

"* * * A person contracting as agent will be personally liable, whether he is known to be an agent or not, in all cases where he makes a contract in his own name, or voluntarily incurs a personal responsibility, either expressed or implied."

"* * * For if the agent contracts in such a form as to make himself personally responsible he cannot afterwards, whether his principal be or be not known, at the time of the contract, relieve himself from that responsibility."

Our conclusion is that Harry W. Fitzpatrick and Fitzpatrick & Co. are personally liable for the effect of the misrepresentations made at the auction sale at which plaintiff purchased the lots, the title to which was never delivered to her, and the purchase price of which she lost as a result of the misrepresentations made at that sale.

William Perry Brown, the manager of the Fitzpatrick Company, whose liability is claimed to result from his conduct as joint tort-feasor, was dismissed by the trial court. Mr. Brown was the manager of the Fitzpatrick Company. Whatever he did in connection with the sale was in that capacity, and he did not conduct the auction and assumed no personal responsibility in connection with it. Whether he was responsible for any of the misrepresentations made at the sale by reason of his failure to as-

certain the true facts is a matter of no moment. He was merely one of the means employed by his employer to investigate the situation. The judgment of the trial court in his favor was correct.

But it is said that the Union Indemnity Company, defendant herein, is not liable as surety because the condition of its liability and the measure of its responsibility precludes recovery. This defendant is sued in the dual capacity as surety on the real estate broker's bond of the Fitzpatrick Company and on the auctioneer's bond of Mr. Harry W. Fitzpatrick. Both bonds are statutory. Act No. 45 of 1908, relating to auctioneers' bonds, and Act No. 236 of 1920, relating to real estate brokers' bonds. As to its liability on the auctioneer's bond, we are referred to a provision of the statute providing that such bond is conditioned upon the faithful performance of all of the duties required by law to all persons who may employ him as auctioneer; the argument being that the plaintiff in this case, a purchaser at the auction sale, cannot be said to have employed Mr. Fitzpatrick as auctioneer, his employer being the Whidden Realty Company. Without discussing this point, we observe that it is unnecessary to the decision of this case, because the defendant surety company is unquestionably liable under its bond covering the activities of Fitzpatrick & Co. as real estate agents. The sale, advertising, and all literature were made and issued in the name of Fitzpatrick & Co. One of the statutory liabilities of a real estate broker's bond is "to pay all damages which may result from his or from their actions as such real estate agents or brokers, and any one who may have been injured or damaged by said agent or broker by any wrongful act done in the furtherance of said business, or by any fraud or misrepresentation by said agency or broker, shall have the right to sue for the recovery of such damages before any court of competent jurisdiction." The fact that a real estate broker sells at auction does not relieve him or his surety of responsibility any more than would be the case in a private sale. As a matter of fact, the occupations of real estate agents and auctioneers are usually combined, and sales commonly made in the pursuit of such business by auction as well as private sale.

For the reasons assigned, the judgment appealed from is affirmed.